```
           THE UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF TEXAS
                  HOUSTON DIVISION

                   *  *  *  *  *

UNITED STATES OF AMERICA     *    No. 4:23-CR-525
                             *    Houston, Texas
VS.                          *    8:43 a.m. - 10:07 a.m.
                             *    11:26 a.m. - 11:47 a.m.
SOHAIB ABUAYYASH             *    February 27, 2024

                   *  *  *  *  *
```

**JURY TRIAL / PARTIAL TESTIMONY**

**(Testimony of Saeda Ivaid)**
**(Testimony of Noubough Midway)**
**and**
**(Testimony of Hamzeh Abuayyash)**

BEFORE THE HONORABLE CHARLES R. ESKRIDGE, III
UNITED STATES DISTRICT JUDGE

```
                   *  *  *  *  *
```

Proceedings recorded by electronic sound recording
Transcript produced by transcription service

*GLR TRANSCRIBERS*
9251 Lynne Circle
Orange, Texas 77630 * 409-330-1610

**APPEARANCES:**

For the United States:

    MR. STEVEN T. SCHAMMEL
    MR. MICHAEL E. DAY
    **U.S. Attorney's Office**
    1000 Louisiana
    Suite 2300
    Houston, TX 77002

For Defendant Sohaib Abuayyash:

    MS. MARJORIE A. MEYERS
    MR. AMR AHMED
    **Federal Public Defender's Office**
    440 Louisiana
    Suite 1350
    Houston, TX 77002

Court Interpreter:

    ROMANY HETTA and NABIL THOME

Case manager:

    JENNELLE GONZALEZ

Electronic Recorder:

    AARON JACKSON

3

**WITNESS INDEX**

Defendant's Evidence:

Saeda Ivaid

Direct Examination by Mr. Ahmed........  4

Cross-Examination by Mr. Schammel...... 45

Noubough "Nina" Midway

Direct Examination by Mr. Ahmed....... 50

Cross-Examination by Mr. Day.......... 59

Hamzeh Abuayyash

Direct Examination by Mr. Ahmed....... 62

Cross-Examination by Mr. Schammel...... 72

Redirect Examination by Mr. Ahmed...... 79

*GLR TRANSCRIBERS*
9251 Lynne Circle
Orange, Texas 77630 * 409-330-1610

**JURY TRIAL PROCEEDINGS**

**FEBRUARY 27, 2024**

**[8:43 a.m. - Requested proceedings as follows:]**

THE COURT:  All right.  You'll recall at the end of the day yesterday the Government had rested, and it is now the time for the defense to call any witnesses, offer any evidence that they would like.

Mr. Ahmed, you may proceed, please.

MR. AHMED:  Thank you, Your Honor.

I call Saeda Ivaid.

***[Pause - Witness enters courtroom]***

THE COURT:  If you'll come over here please, ma'am.  If you'll raise your right hand for the oath.

CASE MANAGER:  Do you solemnly swear that any testimony you are about to give in the case now before the Court will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes.

THE COURT:  Thank you.  Please be seated.

All right.  Mr. Ahmed, please proceed.

**SAEDA IVAID, CALLED BY THE DEFENSE**

**DIRECT EXAMINATION**

BY MR. AHMED:

Q.  Good morning.  Would you please introduce yourself. What's your name?

A.   Good morning.  My name is Saeda Ivaid.

Q.   And can you spell that, please?

A.   First name, S-A-E-D-A.  Last name, I-V-A-I-D.

Q.   Is that last name your maiden name?

A.   No.

Q.   What's your maiden name?

A.   Abuayyash.

Q.   And who is that in the courtroom?

A.   He's my nephew.

Q.   Okay, Sohaib Abuayyash.

A.   Sohaib Abuayyash is my nephew.

Q.   Where are you from?

A.   I'm Palestinian.

Q.   Okay.  And when did you enter the United States?

A.   In March 2004.

Q.   And where do you live now?

A.   Cypress, Texas.

Q.   And how long have you lived in Cypress?

A.   Since July 2020.

Q.   And where were you before that?

A.   Ohio.

Q.   From what years, for what years?

A.   From 2004 until 2020.

Q.   So most of your time in the United States was in Ohio?

A.    Yes.

Q.    And you've been in the Houston area for about four years?

A.    Yes.

Q.    What do you do for employment?

A.    I work for Armada Towing.  It's a roadside assistance.

Q.    And is that -- who do you work for?

A.    My brother, Hamzeh Abuayyash.

Q.    And is that Sohaib's uncle?

A.    Yes.

Q.    Can you tell us a little bit about your experience with entering the United States?  Are you a citizen right now?

A.    Yes.

Q.    How did you become a citizen?

A.    I got married, then I came for a green card approval by my ex-husband.  He applied for me.

Q.    So, before you came to the United States, did you have a green card already?

A.    They give me like an envelope for approval, and when I entered the United States, they do the fingerprint, and like a month later they send me the green card in the mail.

Q.    And that was in what year again?

A.   2004.

Q.   And so you got an approval for a green card through marriage?

A.   Yes.

Q.   And how long were you married?

A.   From 2003 until 2020.

Q.   Did you have children with your ex-husband?

A.   Yes.

Q.   How many children?

A.   I have three.

Q.   How old are they now?

A.   19, 15, 14.

Q.   So you were married for 18 years?

A.   Yes.

Q.   I'm going to show you Defendant's Exhibit Number 17.

A.   Okay.

Q.   Do you remember the first time Sohaib came into the United States?

A.   Yes.

Q.   When was that?

A.   2016.

Q.   And where were you living at that time?

A.   Ohio.

Q.   And where did Sohaib come?

A.   California.

Q.   And why did he come?

A.   It was a family gathering.  We met all together in California at my brother's house.

Q.   Your brother, Hamzeh?

A.   Yes.

Q.   Which is Sohaib's uncle.

A.   Yes.

Q.   And where was Hamzeh living at that time?

A.   California.

Q.   Can you tell us, about how long was Sohaib in California?

A.   It's the summertime.  We met around like in June, after the school break and we spend the whole summer together.

Q.   Did you spend that summer in California?

A.   Yes.

Q.   The whole summer?

A.   Yes.

Q.   So you got time to spend with Sohaib during that time?

A.   Yes.

Q.   And how old was he when he visited the United States for the first time?

A.   12, 13 years old.

Q.   And did he leave after that?

A.   Yes.

Q.   After three months?

A.   Yes.

Q.   And I'm going to show you Defendant's Exhibit 16. Do you remember the second time that he entered the United States?

A.   Yes.

Q.   And how old was he at that time?

A.   16.

Q.   And where were you living at that time?

A.   Ohio.

Q.   And you told us earlier you didn't come to Houston until what month in 2020?

A.   July 2020.

Q.   So, when Sohaib came in June of 2019 --

A.   Yes.

Q.   -- you were in Ohio?

A.   Yes.

Q.   Did you use to speak with Sohaib on the phone at that time?

A.   Yes.

Q.   How often?

A.   At least twice a week.

Q.   And did Sohaib come alone?

A.   No, with his dad.

10

Q.   Okay, that's your brother?

A.   Yes.

Q.   And were you speaking to his brother on the phone?

A.   Yes.

Q.   Okay.  And why did Sohaib come in 2019?

A.   Visit with his dad.

Q.   And how long was he planning to stay?

A.   Like a month, a month and a half.

Q.   Now, you told us you came into the United States with a green card?

A.   Yes.

Q.   So you did not apply for asylum?

A.   No.

Q.   Do you know other people who applied for asylum?

A.   A lot, yes.

MR. DAY:  Objection to relevance, Your Honor.

MR. AHMED:  It's rele --

THE COURT:  Question again?

MR. AHMED:  If she knows other people who applied for asylum.  It's going to go to her foundation of knowing about the process and how she informed my client, just what she said to him, not what he told her.

MR. DAY:  If they want to bring this in, Your Honor, there's more appropriate witnesses.  She didn't even go through the process, so this would be based upon

hearsay of other people's --

MR. AHMED:  It's not for the process.

THE COURT:  Come to sidebar.

MR. AHMED:  Yes, Your Honor.

*[Sidebar as follows:]*

MR. AHMED:  I have a list of documents.  She spoke to my client about these documents.  It is legal and procedural, very simple comments, but I think the jury needs to know a little bit about how she knows about these.

THE COURT:  I think that you can clearly use the documents and whatever she talked with him about.

MR. AHMED:  Okay.

THE COURT:  But you don't get to lay a foundation on like what other people said to her or --

MR. AHMED:  That's fine, Your Honor.

THE COURT:  Okay.

MR. AHMED:  Thank you, Your Honor.

*[Open court as follows:]*

THE COURT:  All right.  You can proceed, Mr. Ahmed.  Thank you.

BY MR. AHMED:

Q.   Before Sohaib came into the United States in 2019, did you have conversations with Sohaib or his father about Sohaib applying for asylum?

12

A.   No.

Q.   After he came into the United States, without telling us what anyone else told you --

A.   Okay.

Q.   -- did you have any conversations about asylum?

A.   Yes.

Q.   With Sohaib's father?

A.   Yes.

Q.   And did you tell Sohaib or his father whether you thought Sohaib should apply for asylum?

MR. DAY:  Your Honor, I'm going to object once again.  Technically, they are still hearsay because they're statements made outside of court.  Whether or not -- and if it in any way goes to illegal issues, she's not --

MS. GONZALEZ:  Come to sidebar again.

*[Sidebar as follows:]*

MR. AHMED:  It's not hearsay, Your Honor. It's not being offered for its truth.  What she told Sohaib about whether he should apply for asylum is not the point of this trial.  The Government's allegation is that he's a fraud and I think we have to show the jury that there was an ongoing back-and-forth discussion about whether he should apply or not.  It's not for the truth.

MR. SCHAMMEL:  They're asking to enter into evidence conversations she had that is going to the truth of the matters asserted.  They're trying to say that they're ongoing conversations as to when it was applied for.  She's now talking about conversations with a minor's father and a defendant.  She's not an attorney, she's not providing legal advice, she's not --

THE COURT:  So what were you intending to ask?

MR. AHMED:  I mean, if she had a back-and-forth conversation the boy's father and whether -- and that she told his father and whether he should apply for asylum, and that she told his father that she didn't think he should apply for asylum, that he's too young and he needed to finish his schooling.

THE COURT:  Oh, she said it to his father, not to him.  I thought you were going to be going over what she talked to him about.  Don't go into what she talked to others about, with the father or anything like that.  But you can question her about a document -- like whatever she showed and talked to the defendant about, you can go into that.

MR. AHMED:  Okay.

*[Open court as follows:]*

THE COURT:  All right.  Just to let the jury know, there are sometimes questions about what the --

14

I have questions about what the questions might be in terms of potential evidence that will come in, and I need to adjust with the attorneys how to properly phrase the question so that only admissible evidence is coming in.  The fact that I have a sidebar conference with them shouldn't affect you one way or the other.  Mr. Ahmed's clarified what he wants to do, and he's now going to proceed with his questions.

Go ahead.

MR. AHMED:  Thank you, Your Honor.

If we can get Defendant's Exhibit No. 1.  I'm sorry, No. 16, please.

BY MR. AHMED:

Q.   So just to go back to my prior question, in June of 2019, do you know if Sohaib entered the United States?

A.   Yes.

Q.   And where did he land?  Where did he go?

A.   Houston, Texas.

Q.   Why Houston?

A.   My brother, Hamzeh Abuayyash.

Q.   Okay.  And just if you can put the microphone in front of you just so everyone's clearly hearing you.

After Sohaib came in 2019, do you know if he started an asylum application?

A.   Yes.

Q.   I'm going to show you Defendant's Exhibit No. 6. If you can go to the last page of Defendant's Exhibit No. 6.  I'm showing you a postage from September 2019. Are you familiar with Sohaib's handwriting?

A.   Yes.

Q.   How are you familiar with his handwriting?

A.   Because we work together in the same company and there's work between me and him.  He has to write notes for me and hand-deliver to me, sometimes daily, sometimes a couple of times a week.

Q.   And that's at the roadside assistance business?

A.   Yes.

Q.   And are there other things about his handwriting that stand out to you?

A.   This looks like --

Q.   Well, before you comment on this.  Just, how do you know his handwriting?  What other things -- is there anything else that would help you recognize whether something is his handwriting?

A.   Yes, because there was a game we played together when he came to my house and played with me and my children.

Q.   How is -- is he writing something?

A.   It's, yeah, it's writing something.

Q.   And are you familiar with the school that he was

educated in Palestine?

A.    Yes.

Q.    Do you know anything about whether or how English writing is taught at that school?

A.    Yes.    They taught us the British type, but not the handwriting, the cursive one.

Q.    So, as far as you know, is Sohaib able to write in cursive English?

A.    No, he's not able to.

Q.    And based on that, looking at this exhibit, the handwritten address that reads 19202 Cypress Green, do you believe that's written by Sohaib?

A.    No.

Q.    Did Sohaib receive help in applying for asylum?

A.    Excuse me?

Q.    Do you know if Sohaib received help in applying for asylum?

A.    Yes.

Q.    And who did he receive help from?

A.    A lady called Nana.

Q.    Okay.    Anyone else?

A.    My brother, Hamzeh.

Q.    Were you actively involved in Sohaib's asylum application?

A.    No.

Q.   Is that -- were you in Ohio at the time?

A.   Yes.

Q.   Okay.  Who is Nana?

A.   I thought she's a lawyer, but later on I knew that she helped with filing only, and fill applications.

Q.   For what?

A.   For immigration asylum, something like that.

Q.   Okay.  Do you remember at some point that there was a problem with Sohaib's asylum application?

A.   Yes.

Q.   And did you say anything to Sohaib about that problem?

A.   Yes

        MR. DAY:  The Government would object to potential hearsay because her statements are all based upon what somebody else may have told her.  So, unless she has personal knowledge, we would object at this time, Your Honor.

        THE COURT:  Overruled.  That question was to what she said; right?

        MR. AHMED:  Exactly, yes, sir.

        THE COURT:  Okay.  Go ahead.

BY MR. AHMED:

Q.   Without saying what anyone else told you --

A.   Yes.

18

Q.   -- what did you say to Sohaib about the problem with his asylum application?

A.   To call Nana again and ask her to see what's the issue and fix it.  And I talked to his uncle, Hamzeh, as well.

Q.   I want to show you Defendant's Exhibit No. 3.  Do you recognize this document?

A.   Yes.

Q.   How do you know this document?

A.   I saw it.  They send me a picture of it.

Q.   And did you talk to Sohaib about this document?

A.   Yes.

Q.   What did you say -- without saying what he said, what did you say to Sohaib?

A.   Do I say it in English or in my language, the way I talked to him about it?

Q.   In English, what did you say?  We do have interpreters in the courtroom, but at this point just tell us what you said to him.  Well, first, were you speaking to him in English or Arabic?

A.   In Arabic.

Q.   And did you say things to him about Defendant's Exhibit No. 3?

A.   Yes.

Q.   In English, what did you say to him?

19

A.   I told him, "This is the receipt.  Keep the original copy in a safe place and keep a copy with you in your pocket, because this is approved that you are legal.  So, if anybody stops you, it's showing that you are legal in here."

Q.   Now, you used the word "legal".  Did you say that word to him in English?

A.   In Arabic.

MR. AHMED:  Your Honor, I would like for her to say that one word in Arabic, as she said it to the defendant, with the help of the court interpreter.

MR. DAY:  Your Honor, I would object because it seems that she's now giving legal advice to certain documents.

THE COURT:  No, overruled.

MR. DAY:  Yes, Your Honor.

THE COURT:  Okay.  Yes, in Arabic, what is the word?

THE WITNESS:  Just the word?  "Qanuni".

INTERPRETER TOHME:  "Qanuni" translates into "legal".

THE COURT:  All right.  And I'll note for the record that was the interpreter, and we can get the name on the record for appearance purposes later.

Thank you.

MR. AHMED:  Thank you.

BY MR. AHMED:

Q.   I'm going to show you Defendant's Exhibit No. 7. Did you and I meet prior to today, a few times?

A.   Yes, that's right.

Q.   Did you and I meet prior to today?

A.   Yes.

Q.   Did we meet at some point early on in the case in October or November of this year?

A.   Yes.

Q.   And where was that meeting?

A.   Where was what?

Q.   Where was that meeting?

A.   First time, it was in the court when I meet you, and then in the company.

Q.   And during one of those meetings, did you hand me original documents?

A.   Yes.

Q.   Related to Sohaib?

A.   Yes.

THE COURT:  Can I just clarify for the record, you had said October of this year.  I think you meant -- or November, whatever it was.  Last year, you're talking about?

MR. AHMED:  Yes.

THE COURT:  Okay.

MR. AHMED:  Thank you.

BY MR. AHMED:

Q.   Where did you get those original documents that you handed to me?

A.   From Sohaib's house.

Q.   I'm going to show you --

If we can go back to Defendant's Exhibit No. 3, please.

MR. AHMED:  May I approach the witness, Your Honor?

THE COURT:  Yes.

BY MR. AHMED:

Q.   Do you recognize the document that I just handed to you?

A.   Yes.

Q.   Does this -- can you describe the document? Actually, let me be more specific.  Can you describe what the document looks like?  What color is it?

A.   It's green.

Q.   Is there anything about the quality of the paper that stands out?

A.   Yes.  It's like thick, not like a normal copy paper.

Q.   And is there some type of picture or watermark on

the picture?

A.   Yes, it's the Statue of Liberty.

Q.   And can you tell me, do you remember that physical piece of paper in front of you?

A.   Yes.

Q.   And looking at the screen, Defendant's Exhibit No. 3, is that the same -- does that appear to be the same document?

A.   Yes.

Q.   And where did you get this document from?

A.   Sohaib's apartment.

Q.   And that was in the end of 2023?

A.   Yes.

          MR. AHMED:  May I approach?

          THE COURT:  You may.

               That's the -- that's a copy of that that's in here.

          MR. AHMED:  Yes.

          THE COURT:  And is a copy made of that page?

          MR. AHMED:  Yes.

          THE COURT:  Do you want that, for any reason, to be admitted as an exhibit so that the jury -- you're describing it's physical context?

          MR. AHMED:  Perhaps.  I think Ms. Meyers may -- I just want to make sure he gets it back.

THE COURT: Well, y'all can confer on that.

MR. AHMED: Okay.

MR. SCHAMMEL: Your Honor?

MR. AHMED: At this time I'm not admitting it.

MR. SCHAMMEL: But one of the purposes is it's admitted and then simply withdraw it at the end of trial.

THE COURT: That, I think, would be fine. And anyways, if you're talking about the physical characteristics of it, I think the jury may want to see it.

MR. AHMED: Okay. And --

THE COURT: So it will be admitted for that and will be withdrawn at the end of trial.

MR. AHMED: Perhaps, for the record, maybe we should label this 3A, Defendant's 3A.

THE COURT: 3A.

MR. AHMED: Okay.

BY MR. AHMED:

Q. I'm showing you Defendant's Exhibit No. 7. Do you recognize that document?

A. Yes.

Q. What is that?

A. This is the -- they approved his work permit.

Q. What date is on the top?

A.   It's on July 28th of 2020.

Q.   I'm sorry, can you repeat it?

A.   July 28th of 2020.

Q.   And were you in Houston at this time?

A.   Yes.

Q.   Do you remember speaking to Sohaib about this document?

A.   Yes.

Q.   I'm going to show you similar to the prior paper --

MR. AHMED:  If I may approach, Your Honor?

THE COURT:  Yes.

BY MR. AHMED:

Q.   Do you recognize that document?

A.   Yes.

Q.   Is that similar to -- the look and feel and watermark, is that similar to Defendant's Exhibit 3A?

A.   Yes.

Q.   And is that a copy of what is shown on the screen as Defendant's Exhibit No. 7?

A.   Yes.

MR. AHMED:  I seek to admit that as 7A, please.

THE COURT:  Any objection to that, on the same basis?

MR. SCHAMMEL:  Yes, Your Honor, that's fine.

THE COURT:  All right, it's admitted.

BY MR. AHMED:

Q.   Let me show you Defendant's Exhibit No. 9.  And do you recognize that document?

A.   Yes.

Q.   And do you remember anything significant about this document?

A.   Excuse me?

Q.   Do you remember anything significant about this document?

A.   Yes.

MR. AHMED:  If I may just have a moment, Your Honor?

THE COURT:  Yes.

*[Pause]*

BY MR. AHMED:

Q.   And I'm going to show you what's marked as Defendant's Exhibit 9A for identification purposes.

MR. AHMED:  This is not something that's been admitted.  It was just filed last night, provided to the Government.

THE COURT:  Okay.

MR. AHMED:  Does the Court have a copy of it?

THE COURT:  I do have a copy of it.

BY MR. AHMED:

Q.   What do you see there in front of you?

A.   It's the work permit for Sohaib.

Q.   What is the whole picture of?

A.   It's my messages that I sent to Sohaib.

Q.   Can you speak up just a little bit?

A.   It's my messages that I sent to Sohaib.

Q.   And is that written in -- is there a date there for those messages?

A.   Yeah, it's August 17, 2020.

Q.   And you said there was a picture?

A.   Yes.

Q.   And if you're looking at Defendant's Exhibit No. 9, can you tell if the Defendant's Exhibit No. 9 is the same as the picture in those text messages?

A.   Yes.

Q.   And who are those text messages between?

A.   Me and Sohaib.

Q.   And there's some text that's written in blue there. What language is that in?

A.   Arabic.

Q.   And are those messages that you are telling Sohaib something about that document?

A.   Yes.

Q.   What do those messages translate as?

A.   Umm, I --

          MR. SCHAMMEL:  Your Honor?

THE COURT:  Hold on one second.

MR. SCHAMMEL:  We object that we don't have an official translation.  The other objection I have is the relevancy of a photo of a document that is otherwise admitted to evidence and the grounds around which it all --

THE COURT:  No, I think, is there a question about what she texted?

MR. AHMED:  Yes.

THE COURT:  And so why wouldn't you seek to move the exhibit into evidence and then go at it from there?

MR. AHMED:  Okay.

THE COURT:  And we'll take it up on that basis.

MR. AHMED:  I can, Your Honor.

THE COURT:  Okay.

MR. AHMED:  I'd ask to --

THE COURT:  Mr. Schammel, on that?

MR. SCHAMMEL:  We just argue as to relevance, Your Honor.  I don't know what the relevance of a separate conversation is.

THE COURT:  No, it's admitted.

MR. SCHAMMEL:  Okay.

THE COURT:  So now it can be published to the jury.

MR. AHMED:  Yes, Your Honor.

THE COURT:  You could address it that way.

MR. AHMED:  If you can put up Defendant's Exhibit No. 9a, please, on the screen.

I'm going to need some help from the court interpreters here shortly, as well.

THE COURT:  Okay.

MR. AHMED:  You can see it on your screen there.

INTERPRETER TOHME:  I just wanted to say that if it is legible, then we could provide sight translation.

MR. AHMED:  Thank you.

THE COURT:  Is he going to -- can you pull the microphone down then, if you're going to translate?

MR. SCHAMMEL:  I believe, also, they need to swear the translator.

THE COURT:  Can I have the translator please stand and raise your right hand.

Sorry, I'm going to swear you in.  Do you solemnly swear that any translation you're about to give will be the true and accurate translation to the best of your ability, so help you God?

INTERPRETER TOHME:  Yes, Your Honor.

THE COURT:  Thank you very much.

MR. SCHAMMEL:  Thank you, Your Honor.

MR. AHMED:  I'm going to hand the copy of Defendant's Exhibit 9A to the interpreter to translate it, to do a handwritten translation for admission to the jury.

THE COURT:  Okay.

MR. AHMED:  And it can be orally translated as well.

I guess, for the record, could I ask the interpreter questions?

THE COURT:  Um --

MR. AHMED:  I just want to make sure his name is on the record.

THE COURT:  Well, yeah, you can get that.

MR. AHMED:  Sir, can you please just state your name for the record?

INTERPRETER TOHME:  Sure.  Nabil Elias Tohme.

MR. AHMED:  And what is your role here today?

INTERPRETER TOHME:  I'm a simultaneous interpreter for federal court.  So is my colleague.

MR. AHMED:  Can you please look at the text messages that are on Defendant's Exhibit 9A?

INTERPRETER TOHME:  Yes.

MR. AHMED:  Can you translate those messages, starting from the blue words under the picture?

INTERPRETER TOHME:  Yes.

"Do not put his picture on any social media."

The second message:  "And anything else that is private, as far as your concern, do not put it so other people or strangers would look at it."

MR. AHMED:  And what is the response?

INTERPRETER TOHME:  I know.

MR. AHMED:  And if we can have that written down.

INTERPRETER TOHME:  Sure, I'm going to write.

BY MR. AHMED:

Q.   Ms. Abuayyash -- Ivaid?

A.   Yes.

Q.   Did you hear the translation?

A.   Yes.

Q.   Is that an accurate translation from what you wrote?

A.   Yes, yes.

Q.   Why did you say these things to Sohaib?

A.   I just gave him advice because he doesn't have experience, and I don't want him to show his private information in the social media because he was happy that he'd received a work permit.

Q.   And this was -- what date were the messages?

A.   It's in July 17, 2020 -- I'm sorry, August 17, 2020.

Q.   And at this time were you in Houston?

A.   Yes.

Q.   And was there anything else that happened that was significant?  How was Sohaib's impression when he received this document?

A.   He was very happy and he invited me and my children for dinner as a celebration.

Q.   I'm going to show you Defendant's Exhibit No. 13.

MR. SCHAMMEL:  Your Honor, just for clarification, I know that defense tendered the original card.

THE COURT:  That is Defense Exhibit 9.

MR. AHMED:  I don't have that one yet.

MR. SCHAMMEL:  Oh, okay.

THE COURT:  Oh, the original.

MR. SCHAMMEL:  I'm sorry, Your Honor, I got confused between the exhibits.

MR. AHMED:  We haven't gotten there, yet.

THE COURT:  Okay.  All right.  I was looking at -- just for the clarification, Defendant's Exhibit 9 was the card that is then also the picture that is on 9A?

MR. AHMED:  Correct, Your Honor.

THE COURT:  And those are both in?

MR. AHMED:  Yes.

THE COURT:  Okay, go ahead.

MR. AHMED:  Thank you.

BY MR. AHMED:

Q.   And Defendant's Exhibit 13, do you recognize that document?

A.   Yes.

Q.   And did you have any conversation -- what is the document?

A.   It's Sohaib's Social Security.

Q.   Did you say anything to Sohaib about this document?

A.   Yes.

Q.   What did you say?

A.   I told him that, "This Social Security is like your ID in the United States.  Don't share it with anybody. Don't give it over the phone to anyone or post it on any of the social media."

Q.   So this in August of 2020?

A.   Yes.

Q.   How old is he at this time?

A.   17, like -- oh no, he was 16.  He didn't turn 17 at that time.

Q.   Defendant's Exhibit No. 14.  Do you recognize that document?

A.   Yes.

Q.   What is it?

A.   Sohaib's driver's license.

Q.   Were you involved in Sohaib getting a driver's license?

A.   Yes.

Q.   How?

A.   He came and asked me what he needed to do, so I wasn't sure as well because I don't know how is the process in Texas, if it's the same as Ohio.  So I took him and we went together to a driving school, and we asked them what's the requirements he needs.  So they told us the process.  We need to watch videos and do tests.  And also, he needs a letter from the school, but I told them he doesn't attend a school, so they told me, because he's not a student, he won't be able to do a driver license until he turns 18 years old.

Q.   Did he ever go to school in the United States?

A.   No.

Q.   What's the farthest grade he completed in Palestine?

A.   Either 9th or 10th.

Q.   Was that schooling in English or in Arabic?

A.   Arabic.

Q.   Did you eventually help him get this document, Defendant's 14?

34

A.   Yes.

Q.   How old was he when he got this?

A.   He turned 18 or 17, something like that.  He wasn't able to take his driver license until he turned 18.

MR. AHMED:  If I may approach, Your Honor.

BY MR. AHMED:

Q.   I'm handing you a card.  What is that card?

A.   Driver license.

Q.   Is that the same thing that's on the screen, Defendant's 14?

A.   Yes.

Q.   Do you remember how -- without saying anything that he said, what was Sohaib's impression when he received his driver's license?

A.   He was so happy.

Q.   I'm showing you Defendant's Exhibit No. 4.

MR. AHMED:  Oh, yes, I would ask to admit the card as Defendant's Exhibit 14A.

THE COURT:  And that was the driver's license?

MR. AHMED:  Yes, Your Honor.

THE COURT:  Okay.

MR. SCHAMMEL:  Same agreement from the Government.

BY MR. AHMED:

Q.   If you can go to page two in the top left corner.

We talked earlier about Sohaib's handwriting.

A.   Yes.

Q.   Can you tell if this is Sohaib's handwriting, or not?

A.   It's not.

Q.   This is -- go to page 3, bottom left corner.

MR. AHMED:   And for the record, this is Defendant's Exhibit's 14, which is an Application for Work Authorization.

THE COURT:   This is 14 --

MR. AHMED:   Yes.

THE COURT:   -- or is it 4?

MR. AHMED:   4, sorry, yes.  Thank you.

THE COURT:   All right.

BY MR. AMED:

Q.   Do you see Question No. 25?

A.   Yes.

Q.   And can you read what it says there under Question 25 in English?  Not the handwriting, but the type.

A.   Okay.  "Your current immigration status for December" --

Q.   That's good.

A.   Okay.

Q.   What does the handwritten section say there?

A.   I'm not sure.  I'm not able to read the cursive.

But the second one, I think it's pending.

Q.   Do you know if that's Sohaib's handwriting?

A.   No way, no.

Q.   I'm going to show you -- go to the last page of Defendant's 4.  It's the postage stamp dated April 2022.  Is that Sohaib's handwriting?

A.   No.

Q.   Defendant's 5.  If you can look at the top part under your signature, just that top paragraph.  Or the one above it.  Can you read the first line there?

A.   "I certify under penalty of perjury under the law of the United States of America."

Q.   Do you know what the word "perjury" means?

A.   No.

Q.   Have I asked you that question before?

A.   Yes.

Q.   When was that?

A.   Yesterday.

Q.   Did I ask you that prior to yesterday?

A.   What's that?

Q.   Did I ask you that question prior to yesterday?

A.   No.

Q.   If you look at the Defendant's Exhibit No. 15, do you recognize that?

A.   Yes.

Q.   What is that?

A.   Driver's license for Sohaib.

Q.   Do you see the date on it?

A.   Yes.  It's -- you mean the expiration date?

Q.   Or the issue date.

A.   August 4, 2022.

Q.   We previously discussed his driver's license from 2021?

A.   Yes.

Q.   Why is there a new driver's license?

A.   Because he renewed his work permit, and after that he needed to renew his driver's license as well.

Q.   Okay.  I'm going to show you Defendant's Exhibit No. 8.  Do you recognize that document?

A.   Yes.

Q.   What is it?

A.   It's that they renewed his new work permit.

Q.   Can you see the date that it was filed there at the top?

A.   Yeah, it's April 1, 2022.

Q.   And the date of the notice?

A.   August 30, 2023.

Q.   And so is that over a year later?

A.   Yes.

Q.   Did you have any conversations with Sohaib?  What

did you say to him about the delay?

A.   I told him I saw a video on the Facebook for **[xx]**, and he was talking about that delay for everybody and not to be worried because the Government extended the time for the work permit.

Q.   And was that during the Covid pandemic?

A.   Yes.

Q.   What did Sohaib -- I'm going to show you Defendant's Exhibit No. 10.  Do you recognize that document?

A.   Yes.

          MR. AHMED:  If I may approach, Your Honor.

BY MR. AHMED:

Q.   Just for the sake of time, I'm handing you two documents.  One is a paper.  Do you recognize -- if we can go back to Defendant's Exhibit No. 8.  That paper, is the look and feel of it similar to the Defendant's Exhibit 3A?

A.   Yes.

Q.   And is that the same thing that's on the screen now, which is Defendant's Exhibit No. 8?

A.   Yes.

Q.   And the card, I handed you a card.  What is that card?

A.   It's the work permit for Sohaib.

39

MR. AHMED:  If we can go to Defendant's 10. If we can go to Defendant's Exhibit 10, please.

BY MR. AHMED:

Q.   Is that physical card that you're holding in your hand the same that's on the screen here in a minute?

A.   Yes.

Q.   And that's Defendant's No. 10.

A.   Yes.

MR. AHMED:  So I'd ask to admit the original work authorization as Defendant's 8A and the card as Defendant's 10A.

MR. SCHAMMEL:  No objection.

THE COURT:  Those are in.

BY MR. AHMED:

Q.   Do you remember how Sohaib felt when he received that card that's in your hand?

A.   He was very, very happy, and he came to my office having some like chocolates and ice cream or things with the fruits, and he passed it to me and all my colleagues in the company, celebrating that he received the card after the long waiting.

Q.   What is the date on the card?

A.   It was August 2, 2023.

Q.   I show you Defendant's 13.  Do you recognize that?

A.   Yeah, it's Sohaib's Social Security.

MR. AHMED:  May I approach, Your Honor?

BY MR. AHMED:

Q.   I've handed you a document.  And just to be clear, all of the documents that I've been handing you so far -- and we've been labeling them as Defendant's Exhibit Number A to correspond to the document -- are all of those documents that you gave to me?

A.   Yes.

Q.   And where did you get all of those documents?

A.   Sohaib's apartment.

Q.   And what is the document that you're holding in your hand now?

A.   What's what?

Q.   What is the document that you're holding in your hand?

A.   It's Sohaib's Social Security.

Q.   Is it the same that's on the screen, the Defendant's --

A.   No, that one on the screen is the old one.

Q.   If we can go to page 2.

A.   Yes, it's the same.

Q.   Did you say anything to Sohaib about this 2023 Social Security card?

A.   Yes, I did.

Q.   Why did he get a second Social Security card?  Do

you know?

A.   Because when the work permit expired, the driver's license expired and the Social Security expired; and as soon as he renews it, he can renew everything and receive a new one.

Q.   Did you say anything to Sohaib about this 2023 Social Security card?

A.   Yes.

Q.   What did you say to him?

A.   Same thing I told him before:  "Be careful, don't share the Social Security number with anybody or over the phone or social media or give it to anybody."

Q.   I'm going to show you Defendant's Exhibit No. 2.

MR. AHMED:  May I approach, Your Honor?

THE COURT:  Yes.

MR. AHMED:  Your Honor, I think I've neglected to ask to admit Defendant's 13A, which was the Social Security card.

MR. SCHAMMEL:  No objection, Your Honor.

THE COURT:  Okay, so Exhibit 13A --

MR. AHMED:  Page 2.

THE COURT:  Page 2.

MR. AHMED:  It's a copy of page 2 of Defendant's 13.

THE COURT:  All right, it will be admitted.

BY MR. AHMED:

Q.    Is the document you're holding in your hand now the same document that's Defendant's Exhibit No. 2?

A.    Yes.

Q.    And is that document you're holding in your hand one of the documents that you got from Sohaib's apartment and gave to me?

A.    Yes.

MR. AHMED:    I'd ask to admit that document as 2A.

THE COURT:    Any objection?

MR. SCHAMMEL:    No, Your Honor.

BY MR. AHMED:

Q.    Do you see a date on that letter?

A.    The only date I see is before July 2022.

Q.    Can you read that first heading in bold that says "What you need to do"?

A.    "What you need to do if you have not already re-submitted your request."

Q.    Okay.    And if you can go down towards the bottom, there's another bold section that says, "What do you need to do if you already" --

A.    "What you need to do if you already re-submitted your request."

Q.    And then the final paragraph under "What happens

next.  Can you read that?

A.   You want me to read the whole thing?

Q.   Just start.  I'll tell you when to stop.

A.   "What happens next.  After December 9, you or your attorney have re-submitted a complete immigration benefits request or request for" --

Do you want me to go more?

Q.   If you could read that from the middle where it says, "We will also".

A.   "We will determine the" --

Q.   No, a little further.  It says, "We will also recognize" in the same paragraph.

A.   "We will also recognize the original attempted filing date as the date of filing for all purposes, including but not limited to determination regarding employment authorization eligibility, the one-year filing deadline for asylum, and other legal provisions at the time of the original attempted filing."

MR. AHMED:  If I may approach the witness, Your Honor?

THE COURT:  Yes.

BY MR. AHMED:

Q.   Did you ever have a conversation with Sohaib about going to a gun range?

A.   Yeah, recently.

Q.   And have you ever been to a gun range?

A.   Yes.

Q.   Under what circumstances?

A.   Just like fun and experience, me and my children.

Q.   How old were your children when you went?

A.   They were 12 and 13.

Q.   And what were the circumstances that you discussed with Sohaib a gun range?

A.   Because at the time, the first time I went to the gun range, I took videos for my children when they do the shooting and posted it on the social media, and then the memory came out.  I reposted it.  So he came and talked to me and he told me, "You have been in a shooting range?"

     I told him, "No, this is a long time, but I'm planning to go on my daughter's birthday again.  If you want to go, we'll take you with us."

Q.   And when was that conversation?

A.   It was in like September.

Q.   So maybe about a month --

A.   September 2023, yeah, because my daughter's birthday was on October 3rd, so I was planning to go on her birthday.

Q.   So this conversation was about a month before he was arrested.

A.   Yes.

Q.   For going to a gun range?

A.   Yes.

          MR. AHMED:  I pass the witness, Your Honor.

          *[Pause]*

          THE COURT:  Mr. Ahmed?

          MR. AHMED:  Yes, Your Honor.

          THE COURT:  The last exhibit was Defendant's Exhibit 2.  Was there a 2A?  I just want to make sure, if there was, that it was admitted.

          MR. AHMED:  I did neglect to admit it.  I'll seek to admit it now.

          THE COURT:  All right.  2A, any objection on that?

          MR. SCHAMMEL:  No, Your Honor.

          THE COURT:  Okay, thank you.  It's admitted.

          *[Pause]*

                    **CROSS-EXAMINATION**

**BY MR. SCHAMMEL:**

Q.   Ma'am, good morning.

A.   Yes, good morning.

Q.   A couple of questions for you.  So I've got Government's Exhibit No. 39 on the screen in front of you.

A.   Yes.

Q.   You also testified to Defense Exhibit No. 4; is that correct?

A.   I can't hear you very well.

Q.   You previously testified to the same exhibit?

A.   Yes.

Q.   So you weren't there when the actual document was completed, were you?

A.   No.

Q.   But I would like to turn your attention to page 5.

     *[Pause]*

Q.   So what was the date that this was submitted?

A.   April -- sorry, March 3rd of 2022.

Q.   And what was the year that Sohaib was born?

A.   2003.

Q.   And do you remember the month?

A.   Umm --

Q.   Would September sound correct?

A.   I think September, yeah.

Q.   So how old was Sohaib then when this document was submitted?

A.   So 17?

Q.   If you need a pen and paper because my math skills are poor.

A.   I'm not good with math.  15 years old, or 16.

Q.   So he was born -- this is occurring before his

birthday in 2022, so his last birthday would have been in 2021?

A.   Yes.

Q.   And he was born in what year?

A.   2003.

Q.   So, 21 minus 3 would be 18; is that correct?

A.   Yes.  I'm not good with math.  Sorry.

Q.   That's okay.  He was -- now we've slowed down, we've done the math.

A.   Yes.

Q.   I had a piece of paper, so I --

A.   Okay, thank you.

Q.   He was 18.

A.   Okay.

Q.   You realize that's an adult; do you not?  He was an adult at 18?

A.   Yes.

Q.   So he's responsible for his documents; is that correct?

A.   Yes.

Q.   He's old enough to vote if he's a citizen or lawful permanent resident?

A.   Yes.

Q.   He's old enough to enter into a contract?

A.   Okay, yes.

Q.   And he's also old enough to be responsible for the documents that are submitted by him or on his behalf; do you agree?

A.   Yes.

Q.   So then he would be responsible for the content of this application; correct?

A.   Yes, but he doesn't have any experience with that.

Q.   But he's still responsible to read and sign, because if we look just above that, he's swearing to this document.  Have you ever filled out a contract?

A.   For asylum, no.

Q.   No, any contract.

A.   Yes.

Q.   Have you ever filled out a government form?

A.   Yes.

Q.   Taxes?

A.   Kind of, yeah.

Q.   Well, you have somebody prepare them; but still, you sign off on the taxes?

A.   Yes.

Q.   And you're swearing that all the information is in there is correct, even if you don't fill it out?

A.   Yes.

Q.   That's what happened here, isn't it?

A.   Yes.

MR. SCHAMMEL:  Nothing further, Your Honor.

MR. AHMED:  Nothing further, Your Honor.

THE COURT:  Thank you very much, ma'am.

THE WITNESS:  You're welcome.

THE COURT:  You may step down.  Thank you for being here today.

Mr. Ahmed, you may call your next witness.

MR. AHMED:  I call Nina Midway.

MR. DAY:  Your Honor, may we approach the Bench?

**[9:36 a.m. - 9:50 a.m. - Sidebar, Recess, and proceedings outside presence of jury, after which the proceedings resumed before the jury as follows:]**

THE COURT:  All right, we will now proceed with the next defense witness, and if Ms. Midway is ready to enter.

MR. AHMED:  Yes, Your Honor.

THE COURT:  Thank you, ma'am.  You can step up over here, please.  Will you please raise your right hand?

CASE MANAGER:  Do you solemnly swear that any testimony you're about to give in the case now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes, I do.

THE COURT:  Thank you.  Please be seated.

THE WITNESS:  Yes, Your Honor.

**NOUBOUGH MIDWAY, CALLED BY AMR AHMED**

**DIRECT EXAMINATION**

**BY MR. AHMED:**

Q.   Good morning.

A.   Good morning.

THE COURT:  If you'll pull the microphone close so we can hear you.

Thank you.  All right.  You may proceed.

Q.   Good morning.

A.   Good morning.

Q.   Can you please introduce yourself to the jury.

A.   My name is Noubough Nina Midway.  They call me Nina.  I'm a licensed court interpreter.

Q.   Can you spell your name for the record, please?

A.   N-O-U-B-O-U-G-H.

Q.   And last name?

A.   Midway.  M-I-D-W-A-Y.

Q.   And is Nina a nickname?

A.   Midway?

Q.   No, Nina.

A.   Nina is my nickname.  Christina, I was baptized.

Q.   Can you tell us about your work experience?

A.   Well, I've been business in 1979, and I work with

the refugee services.  I work as an advisor or academic advisor for **[xx]** mission, and I'm a licensed court interpreter, and I own International Translation Special Services.  It's a D/B/A, so yeah.  But most likely, I work at the court.  You now, federal court, civil, just name it.

Q.   Is that as an Arabic interpreter?

A.   Yeah, I'm a licensed court interpreter.  I'm certified by the JBCC.

Q.   Are you a notary?

A.   I'm a notary, too, yes, sir.

Q.   Do you have experience translating for people in asylum proceedings?

A.   Yes, I do it all the time, except when Covid hit.

Q.   Just tell us about your experience translating for asylum applicants.

A.   I interpret asylum interviews all the time, and people call me from all over the United States to assist their clients when their attorney does not make the appointment.  Yes.

Q.   Are you a lawyer?

A.   I am not an attorney, no.

Q.   Do you recognize my client?

A.   Yes, I do.

Q.   What do you know him as?

A.   Sohaib Abuayyash.

Q.   And can you tell us how you met him?

A.   Through friends or relatives.  You know, I cannot remember exactly.

Q.   Can you tell us why -- did he contact you?

A.   Yes, they always contact me.  I don't contact anybody and I don't advertise.

Q.   Just by word of mouth?

A.   Just a referral.

Q.   Can you tell us why you and Sohaib, what you're speaking about?

A.   Yeah, I met him, I believe, with either his dad or his uncle.  A very nice guy, and he seek some information at that time.

Q.   About what?

A.   We talk.

Q.   About what?

A.   About translating his statement for asylum.

Q.   And where did you meet him for the first time?

A.   I believe at Starbucks Coffee.  Yeah, because I shut down my office when they demolished the building. I still have offices in my life.

Q.   This meeting at Starbucks, was that a social meeting or was that a business meeting?

A.   It's a business meeting.

Q.   And who was there at that meeting?

A.   I believe his uncle.  And his dad has the green eyes, maybe.  I cannot remember, but I remember his uncle.

Q.   Okay.  I'm going to show you Defendant's Exhibit No. 19.  When you assist people with asylum, do you have a certification as part of your business?

A.   Actually, any time I translate a document, I issue my certification.  And I have my stamp and I sign it and I date it, yes.

Q.   Do you recognize this document on the screen?

A.   Yes, of course.  It's my signature and my stamp.

Q.   When and why did you make this?

A.   Because I translated the statement for him.

Q.   For who?

A.   For Sohaib Abuayyash.

Q.   And when was that?

A.   What is --

Q.   Can you look at the document and see if there's a date that would remind you when you did this?

A.   Can you please repeat the question?

Q.   Sure.  Do you see a date on the document?

A.   Yes, yes.  It's 7-25, 2019.

Q.   Is that your handwriting?

A.   Yes, sir, it is.

54

Q.   And if you can look at Defendant's Exhibit No. 20.

A.   Yes.

Q.   Do you recognize this document?

A.   Yes, of course.

Q.   What is it?

A.   This one is what Sohaib and his family gave me to send to the immigration or asylum office.

Q.   Okay.  Is this a document that you typed?

A.   I typed it because they didn't have a computer or he's not -- he has no access to computers.  Usually, the people type an do everything and --

Q.   Can you read through that list of documents, the eight numbers --

A.   Copy of I-589 of Sohaib Sameer Abuayyash, copy of two Palestinian passports for Sohaib Sameer Abuayyash, copy of the statement with the translation, Sohaib Sameer Abuayyash, copy of the birth certificate of Sohaib Sameer Abuayyash, papers from School for Boys with translation, grades from school with translation, copy from internet of School for Boys and pictures, translation certificate.

Q.   You can go to page 2 of Defendant's 20.  Do you see that number 8?

A.   Yes.

Q.   It's handwritten.  Why is that?

A.   Because I have the certification written.

Q.   Did you have to make multiple copies?

A.   Yes.  We had to make three copies at that time for every paper that they give us.

Q.   And those eight documents, are all those the papers that were part of the asylum application?

A.   Yes.

Q.   And did you explain to Sohaib or to his dad that they needed these documents?

A.   Yes, of course, uh-huh.

Q.   And did you help them with mailing?

A.   Yes, I did.  I do the stuff, you know, when the people cannot go to the mail or the post office.  They have no access.  I do that service.  I don't charge for it.

Q.   If you can look at the end of Defendant's No. 6, the last page of Defendant's No. 6.

A.   Yes.

Q.   Do you recognize that document, the first page?

A.   Yes.

Q.   What is that?

A.   This is the application of the asylum.

Q.   If you can look at the last page.  Do you recognize that?

A.   Yes, that's an address.

Q.   Can you read the address?

A.   **[Redacted]**

Q.   Is that your handwriting?

A.   Yes.

Q.   If you look at the top right of that document, all the way top right, there's a little postage.

A.   The date?

Q.   The date.

A.   September 13, 2019.

Q.   There's another date that's all the way in the top right in the papers.  I don't know if you can read that.

A.   What is that?

Q.   Can you read the date on the postage stamp?

A.   It's September 9, 2019.

Q.   And did you mail this document for Sohaib?

A.   Whatever I -- yeah, I mailed his documents actually twice.

Q.   Okay.  I'm going to show you Defendant's 18.  Do you recognize that document?

A.   Yes, sir.

Q.   What is it?

A.   It's an asylum application for, first page.

Q.   And if you can look at the last page of Defendant's 18.  In the address section from --

A.   Yes.

Q.   Is that --

A.   It's 14202, because sometimes they write me handwritten, and the 9, it's like 4.  So --

Q.   Is this your handwriting?

A.   Yes, it is.

Q.   If you can look at the postage stamp, it's going to be on the top left next to the numbers 1505.  On the top right of the paper.  Can you tell what date this was mailed.

A.   It's 1-27-20.  Yes, this is where it was mailed.

Q.   Okay.  And do you remember that there was -- well, why was it mailed twice?

A.   Because of the -- well, the asylum office has like a new -- every once in a while they change a rule.  So there is no N.O.N.A. indoor empty spaces, so that's why.

Q.   Okay.  And at some point was there a package that was given to you?

A.   Yes.  I -- actually, they were very busy at that time, so I have to drive and get it from Sohaib.

Q.   And did you meet with him after that Starbucks meeting?  Did you meet with Sohaib?

A.   Yes, a few times.

Q.   Okay.  And I'm going to show you Defendant's Exhibit No. 3.  Do you recognize this document?  I have to make it a little bit bigger for you.

A.   Can you make it larger, please?

Q.   Yeah.

A.   Yes, I do.

Q.   What is this document?

A.   Acknowledgment of Receipt.

Q.   Okay.  Without saying anything that Sohaib said to you, did you speak to Sohaib about this?

A.   You know, whenever they send me a document, I tell them what it is.

Q.   Okay.

A.   So I can help them out.

Q.   Understood.

A.   And this is a free service.  I mean, I don't charge for it.

Q.   What did you say to Sohaib about this?

A.   This is his receipt from the asylum office.

Q.   And what did you say to him about it?

A.   What I said?  That he can stay in the United States.  Anybody who file asylum and they receive a receipt from the asylum office, they have the whole right to stay in the United States.

Q.   Did you talk to him about the process afterwards?

A.   Yes, of course.

Q.   Did you give him instructions about what he should do if he was to get any more mail from immigration --

A.   Yes.  You know, I always tell the people, you know, if I help them, if I have the time to help them, just mail me the document so I can see what it is.  If I don't know what it is, I ask attorneys because I deal with a lot of attorneys in the Houston area and around Houston and California, everywhere.  So anybody can answer my questions.

Q.   Did you ask -- did you tell Sohaib he could call you about any documents he received?

A.   He called me a few times, every time he received a document, yes.

Q.   And would you help him explain the mail that he received?

A.   Definitely, because it's very important.  Dates are very important, especially fingerprints.

Q.   Okay.

        MR. AHMED:  I pass the witness, Your Honor.

        THE COURT:  Thank you.

            Mr. Day, you may proceed.

        MR. DAY:  Thank you, Your Honor.

                    **CROSS-EXAMINATION**

**BY MR. DAY:**

Q.   Good morning.

A.   Good morning, sir.

Q.   So you are a translator; is that correct?

A.   I'm a licensed court interpreter.  I translate and interpret.  Interpreting in court and translating document paperwork.

Q.   And you're doing that from Arabic to English and vice versa?

A.   That's correct, sir.

Q.   Okay.  And I want to show you what the defense referred to as Defendant's Exhibit 20.  So, looking at this document, it looks like you provided translation in Item No. 3, copy of the statement of translation.  It looks like Item No. 5, papers from School for Boys with translation; and Item No. 6, grades from school with translation.  Are those the documents that you translated?

A.   Maybe those were translated overseas.  I am not sure.

Q.   Okay.

A.   Because I always have a -- I always state what I translate.

Q.   Okay.  So you're not sure if you did the translation of these, or someone else?

A.   I don't see the document.  It's been six years ago. I have no idea.

Q.   Now, in your capacity as a translator, your job is to translate?

A.   To interpret and translate, yes, sir.

Q.   Okay.  You don't provide legal advice or anything?

A.   No, of course not.  I'm not an attorney.

MR. DAY:  I pass the witness.

THE COURT:  All right.

MR. AHMED:  No other questions.

THE COURT:  Thank you very much, Ms. Midway.

THE WITNESS:  Thank you, Your Honor.  Thank you.  I'm honored to be here.

THE COURT:  Thank you very much.  We appreciate that.

THE COURT:  Mr. Ahmed, next witness.

MR. AHMED:  Hamzeh Abuayyash.

*[10:07 a.m. - 11:26 a.m. - Proceedings not requested, after which the requested proceedings resumed as follows:]*

THE COURT:  Your next witness?

MR. AHMED:  Hamzeh Abuayyash.

*[Pause]*

THE COURT:  Mr. Abuayyash, if you'll raise your right hand.

CASE MANAGER:  Do you solemnly swear that any testimony you're about to give in the case now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE COURT:  Pull yourself up a little bit to the microphone.  There you go, all right.

**HAMZEH ABUAYYASH, CALLED BY AMR AHMED**

**DIRECT EXAMINATION**

**BY MR. AHMED:**

Q.   Good morning.

A.   Good morning.

Q.   Can you please say and spell your name for the record?

A.   Hamzeh Abuayyash.  A-B-U-A-Y-Y-A-S-H.  Last name -- I'm sorry, my first name is H-A-M-Z-E-H, and last name is A-B-U-A-Y-Y-A-S-H.

Q.   And can you please introduce yourself?  Where do you live?  What do you do for work?

A.   I live in Cypress, Texas.  I work for Roadside Assistance.  I contracted with the AAA.

Q.   How long have you been in the Houston area?

A.   Houston, Texas, I moved back in 2016.

Q.   And where did you move from?

A.   California.

Q.   Are you a U.S citizen?

A.   Yes.

Q.   And how did you become a U.S citizen?

A.   I applied for asylum.

Q.   When was that?

A.   Back in 2004 or '5.

Q.   And do you know Sohaib Abuayyash?

A.   Yes, he's my nephew.

Q.   Is your brother his paternal uncle?

A.   Yes.

Q.   So his brother is --

A.   His dad is my brother.

Q.   Do you have children?

A.   Yes.

Q.   How many and how old?

A.   Three boys.  Twins, six and six, and five.

Q.   Do you remember when Sohaib came into the United States for the first time?

A.   The first time back in 2016, in California.

     MR. AHMED:  Can I get Defendant's Exhibit No. 17, please?

Q.   And why did he come?

A.   For a visit with my -- his grandfather, my dad and my mom.  Just his grand --

Q.   So Sohaib and his grandparents --

A.   Grandparents, yes.

Q.   -- came to California?

A.   Yes.

Q.   How long did they stay?

A.   For a good three to four months, I would say. Probably more.

Q.   How old was Sohaib at that time?

A.   2016, probably about 13 or 14, I believe.

Q.   And where did he live?  Where did he stay in California?

A.   With me.

Q.   In your house?

A.   Yes.

Q.   And do you remember the next time they came to the United States?

A.   2019.  I believe June or July -- yeah, June.

Q.   And you said you came to the Houston area, to Cypress, in 2016.

A.   Yes.  It was October 2016 when I moved in.

Q.   So, when Sohaib came in 2019 --

A.   Yes.

Q.   -- where did he go?

A.   Where did he go?

Q.   Yes.  Where did he stay?

A.   He stayed with me.

Q.   And who did he come with?

A.   He came with his dad, my brother.

Q.   And when they came, did they plan to return after a certain amount of time?

A.   I'm sorry?

Q.   When they came, did they plan to return back to Palestine to a certain amount of time?

A.   Yes.

Q.   How long were they supposed to stay?

A.   I believe his initial Visa was six months, but the return flight is like within three months.

Q.   And do you remember at some point there being discussion about Sohaib applying for asylum?

A.   Yes.

Q.   When was that?

A.   About two months after, I believe.

Q.   When Sohaib first came into the United States --

          MR. AHMED:   Can we get Defendant's Exhibit No. 1?

Q.   Do you see the stamp there?

A.   Yes.

Q.   Is that date, June 9, 2016, when he came to your house in Houston?

A.   Yes.

Q.   And do you see the date at the bottom there, December 8, 2019?

A.   Yes.

Q.   Was his return flight prior to that date?

A.   Yes.

Q.   And was his father's return flight at that same time?

A.   Yes, both the same time.

Q.   I'm going to show you Government's Exhibit 35. Did someone help with Sohaib with applying for asylum?

A.   Yes.

Q.   Who?

A.   I recall a Nina, I believe.

Q.   Okay.  And did you help him?

A.   No.  I just was basically transportation for him. She did everything for him.

Q.   Okay.  Did you ever meet Nina?

A.   Yes.

Q.   Do you remember the first time you met her?

A.   I met her at Starbucks, yes, inside Target.

Q.   You met her at a Starbucks Coffee Shop inside of a Target Department Store?

A.   Yes.

Q.   And where was that?

A.   Off of Westheimer, just east of Beltway 8, Sam Houston.

Q.   And who was there at that meeting?

A.   Me and Sohaib and his dad and Nina.

Q.   And what was the purpose of that meeting?

A.   That way, she could collect more information about

the asylum case and apply for him.

Q.   And without saying what anyone else said, what did you observe happening during that meeting?

A.   She just collected information.  She had a notebook.  She was asking questions about his name, his date of birth, and his -- why he's applying for asylum.  And she has her asylum application, like a draft.  She was writing on it.

Q.   And was she paid?

A.   Yes.

Q.   How much?

A.   The whole thing to apply, everything and mail everything, I recall probably between 2500 to 3500, or on that range.  I'm not exactly sure.

Q.   Did you pay her?

A.   Yes.

Q.   And was Sohaib able to understand English at that point?

A.   Not that much.  He was speaking in Arabic most of the whole conversation.

Q.   You mentioned collecting information.  Was there also documents that were needed for this?

A.   Yes.

Q.   And I'm showing you Government's Exhibit 35.  Do you recognize that document?

A.   Yeah, this is his birth certificate.

Q.   Is that one of the documents that needed to be provided to her?

A.   Yes, she asked for his passport and birth certificate, something about school.  I mean, like degrees in the school.

Q.   And when Sohaib and his dad came in June of 2019, did they already have this birth certificate with them?

A.   No.

Q.   How was it obtained, if you know?

A.   DHL.

Q.   What is that?

A.   They mail it by DHL.

Q.   From where?

A.   From Palestine.

Q.   And where was it obtained in Palestine?  Who obtained it, if you know?

A.   His wife, my brother's wife.

Q.   Did it have to come from an official government office, or was it just sitting at his house?

A.   No.  You have to request specific degrees for the school and the certificate is actually translated, so they have to translate it from Arabic to English.

Q.   There's a date at the bottom right of this document.  It starts with the number 16.

A.   Yes, it's July 16, 2019.

Q.   So just because that's not the --

A.   That's not the proper way to do it, yes.

Q.   So that's July 16?

A.   Yes, July 16.

Q.   And would that be the date that this was obtained?

A.   Yeah, they do it differently back home.  They put the days and the date, then the year, it should be.

Q.   And that's the date that this was obtained in Palestine?

A.   Yes.

Q.   And was this provided to Nina?

A.   Yes.

Q.   And do you remember there being a problem with Sohaib's application?

A.   Yes.

Q.   What was the problem?

A.   I received a package, I don't recall, it was around October, I'm not sure, which is the whole package return from the immigration office.  And I opened it up, and the first page has -- saying the application's been rejected for two blanks not being filled out.

Q.   Okay.  I'm going to show you Government's 36.  Is that the document that was in the package?

A.   Yes, sir.

Q.   I'm going to show you Government's Exhibit No. --
I'm sorry, Defendant's Exhibit No. 5, last page.  This
was previously submitted and testified to as the
postage that relates to the first asylum, attempted
asylum mailing.  Can you -- the last page.
        Do you recognize this?
A.   This is a priority mail postage, but the address is
wrong.
Q.   Did you write this?
A.   No.
Q.   Can you tell me what that address says?
A.   *[Redacted]*
Q.   I'm going to show you Defendant's Exhibit No. 18,
the last page.  And just without reading it into the
record, can you just look at that address?
A.   142 --
Q.   Don't -- without reading it.
A.   Oh, I'm sorry.
Q.   Is that address that's listed on the last page of
Defendant's Exhibit No. 18, is that your correct
mailing address?
A.   Yes.
Q.   Is that your home?
A.   Yes.
Q.   And you own that home?

A.   Yes.

Q.   And is that a home where Sohaib would receive mail?

A.   Yes.

Q.   When Sohaib came in 2019, how long did he live with you?

A.   For a couple of months, five or six months, I would say probably.

Q.   And after he moved out, did he continue to have -- did you continue to receive mail at that address?

A.   Yes.

Q.   And when he came in 2019, how old was he?  In June of 2019.

A.   I believe he was born like 2002 or 2003, so probably like 16 or 15.

Q.   And at the time that he came, did you have kids? How old were your kids?

A.   My first kids were July 2017.

Q.   Okay.  So you had --

A.   The first one.

Q.   You had two-year-old twins when Sohaib arrived?

A.   July 2017, yes.  After about a couple of months after.

Q.   Okay.

A.   I'm sorry, two years prior to Sohaib arriving.

Q.   And so Sohaib moved out, but his mail continued to

arrive at your address?

A.   Yes.

Q.   And so whenever mail would come to your address, what would you do?  Whenever Sohaib's mail would come to your address, what would you do?

A.   It depends.  If it's immigration or something important, I would open it sometimes.  And if it's something not related, I will send him or shoot him a picture and tell him, "This is mail for you," and I will take it with me to where he lived.

Q.   Okay.  Would you discuss those documents with him?

A.   Not all the documents.  A couple of them, yes.

Q.   I'm going to show you Defendant's Exhibit No. 3. Do you recognize this document?

A.   This is the receipt, I believe.

          MR. AHMED:  If you can zoom in.

A.   Yeah, this is the receipt notice for receiving the application, basically.

Q.   And without telling us what Sohaib said, did you say anything to Sohaib about this?

A.   Oh, yes.

Q.   What did you say to him?

A.   I told him, "I received your receipt, your asylum receipt and you're legal right now."

Q.   Did you say that in English or Arabic?

A.   Arabic?

Q.   And can you tell us in Arabic what the word is that you told him?  Hold on.  If you want to say the whole sentence in Arabic, that's fine.  I just want to make sure the interpreter will interpret it.

A.   The whole thing?

Q.   What did you say to him, as best as you can remember?

A.   *(Answering in Arabic).*

INTERPRETER:  "So we got the letter with the receipt about the asylum from Immigration, and now you are legal."

Q.   And what was Sohaib -- without saying what he said, what was Sohaib's reaction?  What was his impression?

A.   He was so happy about it.

Q.   Did you tell him to do something with that paper?

A.   To keep it in a safe place and keep it forever.

Q.   You said you received asylum?

A.   Yes.

Q.   Do you still have your receipt?

A.   I still have my receipt, yes.

Q.   The original one?

A.   The original one.

Q.   When did you become a citizen?

A.   About 10 years, 11 years ago, I'll say.

MR. AHMED:  I pass the witness.

THE COURT:  Mr. Day or Mr. Schammel?

MR. SCHAMMEL:  I will, Your Honor.

THE COURT:  All right.  You may proceed.

MR. SCHAMMEL:  May I approach the Elmo, Your Honor?

THE COURT:  Yes.

**CROSS-EXAMINATION**

**BY MR. SCHAMMEL:**

Q.   I'm going to show you what was marked as Defendant's Exhibit 18.  And when you look at the back, it talks about the *[Redacted]* address; correct?  You lived at *[Redacted]*?

A.   Yes.

Q.   You said that the second address they said was correct, *[Redacted]*?

A.   Yes.

Q.   So, on this application, we do have the correct address, looking right here at **[xx]**.

A.   This is also the correction, yes.

Q.   So you then received all the subsequent mail for Mr. Sohaib Abuayyash; correct?  You got notices from the Government, you got a bunch of other stuff, too.

A.   The only other thing I received for the immigration, I will say, just the receipt after the

second time attempting after we fixed it, and the rejection.  And after that, in August of last year, I received his work permit after re-applying.

Q.    So when did he start working for you?

A.    He did not work for me until like 2020.

Q.    How old was he them?

A.    2020, he may have been 17, I'll say.  I'm not sure.

Q.    Was he still working for you up until the time that he was taken into custody?

A.    Yes, sir.

Q.    What kind of employee is he?

A.    He's a hard-working employee.

Q.    You said that you have a contract to do roadside assistance for AAA?

A.    Yes.

Q.    Do they have a bunch of procedures you're supposed to follow?

A.    Yes.

Q.    Do you have to be current on those procedures?

A.    Do I what?

Q.    Do you have to read and understand those procedures?

A.    It depends on what kind you're applying for.

Q.    But do they send you directions, like you should do this and this is --

A.   No, they only tell me to basically have a clean background, which I do through a third party.

Q.   Okay.  And then is there any instructions to you on what services to provide?

A.   Instruction of what?

Q.   Does AAA provide instructions about how you're supposed to proved service or things you're supposed to do?

A.   Not on everything, but the customer service satisfaction was, yes.

Q.   And all that information gets passed on to Mr. Sohaib Abuayyash?

A.   Package as a policy, yes.

Q.   Did you have a translator come in to handle that for him?

A.   Translator?

Q.   Yes.  The package, was it in Arabic or English?

A.   It's in English.

Q.   Did you have a translator for him?

A.   I did translate.

Q.   And did he understand it?

A.   Yes.

Q.   Okay.  So, but what does he do in the rest of his life when he's out in public in a society that is largely English dominant?

A.   He usually asks me some questions about stuff, and he searched.

Q.   And does he do that in important things?

A.   I know he does TikTok and all that.

Q.   Okay.  But when something's important, like instructions on how to provide service for AAA, you make sure he understands?

A.   As an employee in that company, he was only in that yard doing the mechanic work and helping.  There's not much to understand about the rules for outside.

Q.   So, if he takes the time to understand what he needs to do for his job as an adult, shouldn't he be taking the time to also understand his immigration process?

A.   I'm sorry?

Q.   If he takes the time to understand what it is he needs to do for his job, wouldn't you expect him to also take the time to understand his immigration process?

A.   I expect that, but the same thing --

Q.   In fact, you all went out and tried to get somebody to help through the process just so he would understand everything that's going on?

A.   I'm sorry, one more time.

Q.   You hired somebody; correct?

A.   I didn't hire -- I hired somebody for his asylum.

Q.   Right, to help understand the process.

A.   Yes.

Q.   And then when he became an adult, it's his responsibility, isn't it?

A.   No, she still helped him all the way.

Q.   But as an adult, isn't he responsible for his actions?

A.   Adult?  It depends who the -- it's not about age.

Q.   It's about being an adult under the law, though. So you complete your income taxes every year; correct?

A.   Yes.

Q.   And you sign off that you understand what's going on in the income taxes, and you confirm that it's correct?

A.   Yes, sir.

Q.   Would you say the immigration is probably at least as important as the income tax?

A.   It's not least important.  It is about we just get excited and happy when -- especially if my first time, when I applied the first time.  In his case, too, when we received the letter of receipt, that's all we need to see.

Q.   And then you just ignored the rest of it?

A.   Not ignore it, no.  But we're just happy, I mean,

know we're legal, so we just continue our life.

Q.   But did you take the time when you did yours to follow the rules?

A.   Me personally?

Q.   Yes.

A.   I did not search for what I need to do other than just I have my work permit and my social.

Q.   So you didn't bother to check and understand what laws you're supposed to follow during this?

A.   I did not, no.

          MR. SCHAMMEL:  I pass the witness, Your Honor.

          MR. AHMED:  Just brief.

**REDIRECT EXAMINATION**

**BY MR. AHMED:**

Q.   Can you tell us what Sohaib's job duties are at Armada?

A.   Yeah, he's a yard keeper, he's cleaning the yard, helping the mechanic, cleaning the office, just small duties in the shop.

Q.   Is he a mechanic?

A.   No, he's a helper.

Q.   Does he have any licenses?

A.   No.

Q.   Is he certified in any trade?

A.   No.

Q.   What's the furthest level of education he has?

A.   He finished -- no, he didn't finish high school, I believe.  He did not finish that, which is like ninth grade or tenth grade, I believe.

Q.   As part of his job, is he required to do a lot of reading?

A.   No.

Q.   Is he required to sign things?

A.   No.

        MR. AHMED:  I pass the witness.

        MR. SCHAMMEL:  Nothing further.

        THE COURT:  All right, thank you, sir, for being here.

        THE WITNESS:  Thank you.

        THE COURT:  You may be excused.

        *[11:47 a.m. -- End of requested proceedings]*


                C E R T I F I C A T I O N


     I certify that the foregoing is a correct transcript of the electronic sound recording of the proceedings in the above-entitled matter.


/s/ Gwen Reed

4-13-24